J-S37018-22

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: C.R., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: G.R., FATHER | : : : : : : : | |
| | : | No. 1715 EDA 2022 |

Appeal from the Order Entered June 7, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001311-2012

BEFORE:  BOWES, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED DECEMBER 08, 2022**

G.R. ("Father") appeals from the order, entered in the Court of Common Pleas of Philadelphia County, adjudicating his child, C.R. (born 8/2007) dependent.  After our review, we affirm.

The trial court set forth the history of this case as follows:

The Philadelphia Department of Human Services (DHS) became aware of this family on January 29, 2019, when it received a General Protective Services (GPS) report alleging that C.R. was in special education and was attending school without wearing socks or underwear.  The report also alleged C.R. attended school with feces on him and his clothing, and that Mother did not provide the school with a change of clothes for him.  This report was determined to be valid.  When DHS interviewed C.R., they observed that he was malodorous and there were feces in his pants.

When DHS interviewed Mother in her home on January 30, 2019, she denied the allegations in the GPS report.  DHS assessed Mother's home and found that the home was not appropriate for C.R.  There was no working electricity, heat, or hot water in the home.  In February 2019, DHS implemented In-Home Services in

maternal grandmother's home and the family began residing there.

On July 29, 2021, DHS received a GPS report alleging that C.R. was physically abused while in the care of his Father in Oklahoma. The report stated that there was a shared custody agreement between Mother and Father in which C.R. resided with Father during the school year and with Mother during the summer. The GPS report further alleged that C.R. returned to Mother's home in May 2021 and Mother observed that C.R. had bruising on his back and a bite mark on his arm. The report alleged that C.R. disclosed the Father's paramour physically abused him, threatened him with a power drill, and put the drill on his hand. Additionally, the GPS report alleged that C.R. needed behavioral health services to address the abuse. This report was referred to the Oklahoma Department of Human Services.

DHS also spoke with C.R. on July 29, 2021. C.R. stated that his stepmother pointed a drill at him and threatened to drill him on his eye. C.R. stated that his stepmother then put the drill on his palm and drilled his skin, which resulted in a cut on his hand.

On September 9, 2021, DHS conducted an unannounced visit at Mother's home. Mother refused to allow DHS to assess the inside of the home. When the police arrived and allowed DHS access to Mother's home, DHS observed that the home did not have a refrigerator or any hot water, the stove was inoperable, and the sleeping conditions were not appropriate. On September 9, 2021, Mother and C.R. began residing in maternal grandmother's home pursuant to a Safety Plan which stated that the children would not return to Mother's home.

Trial Court Opinion, 7/20/22, at 1-3 (citations to record omitted).

On October 29, 2021, DHS filed a petition to adjudicate C.R. dependent. The court appointed Jeffrey Bruch, Esquire, as counsel and guardian *ad litem* ("GAL") for C.R.[1] An adjudicatory hearing was held on June 7, 2022, at which time DHS Supervisor, Michelle Ludwig, testified. Ludwig testified that her unit

_____

[1] Attorney Bruch has submitted a letter to this Court in which he joins in the brief filed by DHS and states that he believes the trial court's decision to be in his client's best interest.

investigated a report involving C.R. and that several home visits were conducted. N.T. Adjudicatory Hearing, 6/7/22, at 11. Ludwig testified that during a home visit on September 9, 2021, the DHS investigator observed that Mother's home was in a "deplorable" condition. *Id.* at 12. Specifically, the kitchen was completely inoperable, there was no functioning water and very limited food in the home, there was trash around the home, and the walkway was unsafe. *Id.* Ludwig stated that when DHS received the report, Mother stated that C.R. was not enrolled in school because he had recently returned from Father's home in Oklahoma. *Id.* at 14

Ludwig further testified that, during her investigation, she learned that Father had primary physical custody, but C.R. did not wish to return to Father's care. *Id.* at 14-15. Ludwig testified that on November 12, 2021, she received a Child Protective Services ("CPS") report alleging that C.R. suffered physical abuse by Father. *Id.* at 18. Ludwig stated that this report was investigated, but determined to be unfounded. *Id.*

On cross-examination by Mother's counsel, Ludwig testified C.R. was diagnosed with failure to thrive and that he was malnourished when he returned to Mother's care after being with Father. *Id.* at 19.

Community Umbrella Agency ("CUA") Case Manager, Elgren Green, also testified at the adjudicatory hearing. Green testified that C.R. and Mother continue to reside with maternal grandmother and that C.R. is currently enrolled as a ninth grader in West Philadelphia High School. *Id.* at 27, 30. Green testified that C.R. is currently safe and receiving the services that he

needs. *Id.* at 31, 34. Green stated that Father wanted C.R. to return to live with him in Oklahoma, but that C.R. wished to remain in Philadelphia with his Mother and siblings. *Id.* at 33.

On cross-examination by the Child Advocate, Green testified that C.R. told him that Father's paramour had used a drill on his hand while he was in Father's care and that he had also been bitten by a dog while staying with Father. *Id.* at 34-35. On cross-examination by Mother's counsel, Green stated that C.R. is "doing really well" in school and has A's and B's. *Id.* at 36. Green opined that it would be in C.R.'s best interest to remain in Mother's care in maternal grandmother's home. *Id.* at 36.

Mother testified that, when C.R. returned to her home in Philadelphia on May 26, 2021, after residing in Oklahoma with Father, she noticed bruising and dog bites on C.R.'s arm. *Id.* at 41-42. Mother stated that C.R. informed her that he sustained the bruises after Father's paramour "beat him with a pot" and that he had been bitten by Father's paramour's dog. *Id.* Mother testified that, as a result of the allegations of abuse, she refused to send C.R. back to Oklahoma. *Id.* at 42. Mother testified that C.R. had gained 15 pounds while in her care. *Id.* at 44.

Father testified remotely from Oklahoma. Father stated that, when C.R. resided with him in Oklahoma, he was attending school and receiving medical treatment. *Id.* at 52. Father denied the allegations of failure to thrive and testified that C.R. had been up to date on his shots and was seeing a specialist in Oklahoma. *Id.* at 53. Father testified that he and his paramour were

divorced and denied the allegations that C.R. had been physically abused or bitten by a dog. *Id.* at 53-54. Father stated that when he questioned C.R. about the allegations, C.R. told him "nothing happened." *Id.* at 54-55. Father testified that he was unaware of the allegation that his paramour pointed a power drill at C.R.'s hand. *Id.* at 55.

On June 7, 2022, the court issued an order adjudicating C.R. dependent due to lack of parental care or supervision pursuant to 42 Pa.C.S.A. § 6302. Father filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, Father asserts that DHS failed to sustain its burden of proving by clear and convincing evidence that C.R. is dependent. *See* Brief of Appellant, at 8.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013). "The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73–74 (Pa. Super. 2004) (citation omitted). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In re Adoption of L.A.K.*, 265 A.3d 580, 587 (Pa. 2021).

Dependency proceedings are governed by the Juvenile Act ("Act"), 42 Pa.C.S.A. §§ 6301–6375, which defines "dependent child," in relevant part, as follows:

"Dependent child." A child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302. In determining whether a parent is providing a minor with proper care and control, the parent's acts and omissions should weigh equally. *In re R.W.J.*, 826 A.2d 10, 14 (Pa. Super. 2003). In order to adjudicate a child dependent, the court must determine that the above definition has been met by clear and convincing evidence. *A.B.*, 63 A.3d at 349.

Father argues that there was no testimony that C.R. was being neglected while in Father's care. In support of his claim, Father cites his own testimony that C.R. was attending school and receiving medical care while living with him, as well as his denial of physical abuse or failure to thrive while in his care. Father also notes that DHS investigator Michelle Ludwig testified that she was unable to determine in whose care C.R. was when failure to thrive became an issue. Father argues that "the court's decision to find [C.R.]

dependent was not consonant with the fundamental purpose of the Act, which is to preserve the unity of the family." Brief of Appellant, at 15. He is entitled to no relief.

The court set forth its rationale for adjudicating C.R. dependent as follows:

> In adjudicating C.R. dependent, this Court determined that DHS had met its burden by demonstrating that C.R. was a dependent child and was without proper parental care and control. Father's counsel argues that Father is ready, willing, and able to parent C.R. However, at the June 7, 2022, adjudicatory hearing, this court found that it would not be in C.R.'s best interest to be reunified with Father at that time. This Court heard credible testimony from DHS Supervisor, Ms. Ludwig, and CUA Case Manager, Mr. Green, that there were concerns for C.R.'s safety and welfare if he should be returned to Father's care. C.R. disclosed to DHS and CUA that while he was residing with Father in Oklahoma, Father's paramour put a power drill on his hand and threatened to use the drill against him. C.R., who was fourteen years old at the time of the adjudicatory hearing, reported to the DHS Investigator and Mr. Green that he did not wish to return to Father's care. C.R. stated that he wished to remain in Philadelphia with Mother and his siblings. C.R. did not disclose [to DHS] why he did not wish to return to Father's care[.] However, C.R. informed Mr. Green that he did not wish to reside with Father just after he disclosed the power drill incident to him.
>
> There are currently outstanding dependency concerns for Father which remain barriers to reunification. Mr. Green testified that CUA requested a courtesy home visit from Oklahoma Children and Youth Services (CYS) to determine if Father's home was appropriate for C.R. However, Oklahoma CYS did not perform a courtesy visit and did not provide a reason why. At the time of the adjudicatory hearing, CUA was not able to conduct a home assessment of Father's home in Oklahoma and it was unclear whether Father's home was appropriate for C.R. Additionally, the record reflects that C.R. was diagnosed with failure to thrive and was malnourished when he returned to Mother's home in May 2021 after residing with Father during the school year.

> After hearing the evidence presented, this court found that DHS met its burden by clear and convincing evidence that C.R. was a dependent child pursuant to 42 Pa. C.S.A. § 6302(1) and was without proper parental care or control. Such proper parental care was not immediately available due to the Child's malnourishment and failure to thrive in Father's care. Additionally, the bruises Mother observed on C.R. when he returned to Philadelphia[,] as well as the incident he disclosed regarding Father's paramour threatening him with a power drill[,] are concerning to this court.

Trial Court Opinion, 7/20/22, at 8-9 (unnecessary capitalization omitted).

The record in this matter supports the trial court's factual findings, and we can discern no error of law in the court's conclusion that C.R. is a dependent child and that Father lacks the present ability to provide proper parental care to C.R. The court did not find Father's self-serving testimony to be credible and, instead, credited Mother's testimony regarding the injuries to C.R. that she observed upon C.R.'s return to Philadelphia from Oklahoma, as well as the testimony of the DHS and CUA caseworkers regarding C.R.'s reports of abuse in Father's home and his desire not to return to Father's care.[2] *See In re M.G.*, *supra* (trial court free to make all credibility determinations). In light of that testimony, the court was within its discretion to decline to return C.R. to Father's care, particularly where DHS has been unable to determine whether Father's Oklahoma home is appropriate and safe.

Order affirmed.

---

[2] We note that the trial court also interviewed C.R., off the record, during the adjudicatory hearing. *See* N.T. Adjudicatory Hearing, 6/7/22, at 39 (court clearing courtroom and interviewing C.R. off the record). His testimony was sealed and not made a part of the certified record on appeal.

- 8 -

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 12/8/2022*